UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2010 DEC 28  AM 10:50

BY_____
DEPUTY CLERK

ROY TOWSLEY,                         )
                                     )
        Plaintiff,                   )
                                     )
v.                                   )    Case No. 5:09-cv-23
                                     )
WILLIAM FRANK,                       )
                                     )
        Defendant.                   )

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING
PLAINTFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**
(Docs. 39, 47)

Plaintiff Roy Towsley brings this civil rights action under 42 U.S.C. § 1983 against Officer William Frank of the Springfield, Vermont Police Department ("SPD"). Mr. Towsley alleges that Officer Frank used excessive force when Officer Frank participated in arresting Mr. Towsley for a parole violation. Presently before the court are Officer Frank's motion for summary judgment in which he asserts qualified immunity from suit (Doc. 39), and Mr. Towsley's cross-motion for partial summary judgment on the issues of excessive force and qualified immunity (Doc. 47). The court heard oral argument on these motions on December 2, 2010. Mr. Towsley is represented by David J. Williams, Esq., and Officer Frank is represented by Nancy G. Sheahan, Esq.

For the reasons set forth below, Officer Frank's motion is granted in part and denied in part, and Mr. Towsley's motion is denied.

I.      **Factual Background.**

        A. **Undisputed Facts.**

On August 14, 2007, Mr. Towsley was a convicted felon on parole in Springfield, Vermont with a maximum release date of December 31, 2014. His prior convictions included resisting arrest, felony escape from the custody of an officer, domestic assault,

and sexual assault on a minor. Mr. Towsley did not report to work on August 14th because he had spent the prior night getting high on cocaine. Later in the afternoon that same day, he went to the apartment of Mike Chizmar in Springfield where he further used crack cocaine as well as methadone.

Officer Frank was familiar with Mr. Towsley, having been personally involved in Mr. Towsley's arrests for felony escape, resisting arrest, unlawful trespass, and unlawful mischief. Officer Frank was also familiar with other incidents in which Mr. Towsley had been arrested in Springfield for violent crimes.

During the afternoon of August 14, 2007, Department of Corrections Community Corrections Officer ("CO") Al Franklin was tasked with arresting Mr. Towsley for using illegal substances in violation of his parole. CO Franklin was instructed to request assistance from the SPD in effecting the arrest because of Mr. Towsley's history of being armed, attempting to flee, and the suspicion that he might be under the influence of drugs.

SPD Officers Frank, Bill Daniels, and Frank Schippert, all dressed in uniform, accompanied CO Franklin to arrest Mr. Towsley. They each wore a microphone that transmitted audio to receivers in their respective police cruisers that recorded what transpired during Mr. Towsley's arrest. Officer Frank understood they were arresting Mr. Towsley for violating his parole, and knew that Mr. Towsley had a number of years remaining on his prison sentence. After initially failing to find Mr. Towsley at his own residence, the officers learned of his location and arrived at Mr. Chizmar's apartment approximately one hour after Mr. Towsley's most recent ingestion of crack cocaine.

The officers knocked on the door and an occupant let them into the one-room apartment. Mr. Towsley was seated in a recliner next to a window that was immediately to his right, and on the opposite side of the room from where the officers entered. He was shirtless and under the influence of both crack cocaine and methadone. There was an air conditioner on the left-hand side of the window sill, and the window was closed so that it rested on top of the air conditioner. The main window had wooden cross members and

there was a storm window behind it. The officers did not observe any obvious weapons such as a knife or gun either on Mr. Towsley's person or within his reach.

Upon entering Mr. Chizmar's apartment, Officer Frank immediately unholstered his "Taser X26" and aimed it at Mr. Towsley, and Officer Schippert drew his firearm to provide cover for Officer Frank. The Taser is a non-lethal weapon that, when deployed, propels a pair of barbed probes which are connected to the Taser by thin insulated wires. Upon impact with a targeted person, the Taser delivers a high voltage electrical charge that overrides the person's central nervous system and causes uncontrollable muscle contractions, thus temporarily incapacitating the person. Typically, incapacitation occurs only during the actual deployment of the Taser, and a person can recover immediately once the Taser cycle is complete. If an initial deployment and electrical charge fails to induce compliance—an occurrence that, according to Officer Frank's training, is expected to occur approximately half the time—the Taser may be activated again. On subsequent activations, the electrical charge runs to the barbs already lodged in the targeted person; the person will be unaffected if the barbs have fallen off. Officers are instructed that it is generally preferable to use the Taser with an individual who has a history of violence than to go "hands on" with the individual because "hands on" presents a greater risk of injury to the officer, the suspect, and others in the immediate area.

Once the officers were inside the apartment, Officer Frank took primary responsibility for communicating with Mr. Towsley. Officer Frank immediately told Mr. Towsley to "c'mere," and "turn around." Mr. Towsley responded by telling Officer Frank not to "hit" him "with that fucking gun," referring to the Taser. Mr. Towsley also threatened to jump out of the window, and told Officer Frank that he would take his Taser and "shove it up [his] ass." After these threats, Officer Frank instructed Mr. Towsley to turn around two additional times.

Approximately one minute after the confrontation began, Mr. Towsley asked Officer Frank, "Will you talk to me first?" Officer Frank then warned Mr. Towsley that if Mr. Towsley took one more step, "you're getting it," meaning he would deploy the

3

Taser. Mr. Towsley asked if he could put his shirt on, and indicated that he would turn around and submit to arrest if the officers "put the gun away." Officer Frank then repeated his commands to "turn around and put your hands behind your head." Mr. Towsley was asked to either turn around, turn around and put his hands behind his back, or to "do it now," a total of twenty-six times. In the midst of these directives, Mr. Towsley asked to smoke a cigarette, and informed CO Franklin that the items on his person included a wallet, cigarettes, and a watch. At some point, Mr. Towsley was permitted to put on his shirt.

The confrontation concluded approximately two and a half minutes after it began under disputed factual circumstances. It is undisputed that, after Mr. Towsley verbally listed his personal effects, Officer Frank deployed his Taser, and at least one of the two Taser barbs struck Mr. Towsley. Mr. Towsley then went through the window, landing on the concrete sidewalk one story below. As a result of the fall, Mr. Towsley suffered a fracture of his left acetabulum, or hip socket, and the adjacent pelvic bones. When he landed, no officers were outside on the street to place him under arrest.

On the first deployment, the Taser remained active for a six second interval. Two seconds after the first Taser discharge ended, and while Mr. Towsley was on the sidewalk, Officer Frank activated the Taser again. During this time Officer Frank loudly stated, "I got him. I still got him." Officer Schippert exited the building after the second activation and placed Mr. Towsley into handcuffs.

### B. Disputed Facts.

The parties dispute what occurred during the final moments of the officers' confrontation with Mr. Towsley when Officer Frank first deployed his Taser inside the apartment, and then did so again when Mr. Towsley was outside on the sidewalk. Mr. Towsley claims that Officer Frank fired his Taser after Mr. Towsley agreed to surrender, and while Mr. Towsley was discussing his personal effects with CO Franklin in preparation for submission to arrest. According to Mr. Towsley, he was backing away as CO Franklin approached him with handcuffs. He then began turning to face the window

4

and turn his back to the officers, but was tased before he could complete that maneuver. He alleges that the Taser barbs struck him in the chest, causing him to fall backwards into the window, through which he fell onto the sidewalk below.

As to the second tasing, Mr. Towsley concedes that he has no memory of his fall or landing on the sidewalk. But based on the severity of his injuries, the short two-second interval between the two Taser activations, and what he claims is audible moaning recorded by the officers' microphones after the first tasing, he asserts that he could not have even attempted to rise from the sidewalk before Officer Frank activated the Taser a second time.

According to Officer Frank, Mr. Towsley never agreed to surrender and never submitted to arrest. Instead, when CO Franklin approached Mr. Towsley with handcuffs, Mr. Towsley moved quickly toward the window in an attempt to escape. Mr. Towsley struck the window, but did not break through. He then quickly turned back and made a second attempt to jump through the window, at which point Officer Frank deployed the Taser to prevent his escape. Although the Taser barbs struck Mr. Towsley and delivered an electric shock, Mr. Towsley successfully jumped through and out of the window. Officer Frank says that the Taser barbs struck Mr. Towsley on his back, near his side, and never made contact with his chest. According to Officer Frank, the Taser did not cause Mr. Towsley to fall through the window; rather, Mr. Towsley intentionally jumped out of the window and the Taser failed to stop him.

After Mr. Towsley fell to the ground, Officer Frank claims that he saw him attempt to get up off the pavement and flee, and thus re-activated his Taser because there were not yet any officers on the street to detain Mr. Towsley. Based on Officer Frank's experience, it is possible for individuals to escape after a fall such as that sustained by Mr. Towsley.

## II. Standard of Review.

Summary judgment should be granted when the record shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of

law. Fed. R. Civ. P. 56(c). In deciding the motion, the trial court must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party, and decide whether a rational juror could decide in favor of that party under applicable law. *Scott v. Harris,* 550 U.S. 372, 378 (2007).

To preclude summary judgment, however, the non-moving party must offer more than "mere speculation and conjecture[.]" *Harlen Assoc. v. Inc. Vill. of Mineola,* 273 F.3d 494, 499 (2d Cir. 2001). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986). In other words, only "disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 249.

This standard does not change when the parties file cross-motions for summary judgment. In such cases, "the court 'must evaluate each party's motion on its own merits taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *Bronx Household of Faith v. Bd. of Educ. of City of New York,* 492 F.3d 89, 96 (2d Cir. 2007) (quoting *Hotel Emp.s & Rest. Emp.s Union, Local 100 v. City of New York Dep't. of Parks and Recreation,* 311 F.3d 534, 543 (2d Cir. 2002)).

III. **Legal Analysis.**

Mr. Towsley alleges that Officer Frank's use of the Taser constitutes excessive force under the Fourth Amendment to the U.S. Constitution.[1] Officer Frank argues in response that, because Mr. Towsley was a parolee, his claim properly falls under the

---

[1] Mr. Towsley's Complaint also lists a Fourteenth Amendment substantive due process claim and several state law claims. The due process claim is redundant of the Fourth Amendment claim and need not be considered separately. *See United States v. Lanier,* 520 U.S. 259, 272 n.7 (1997). On December 2, 2010, without objection, the court entered summary judgment in favor of Officer Frank on Mr. Towsley's state law claims. (Doc. 69.)

6

Eighth rather than Fourth Amendment. In either case, he argues that the amount of force used was reasonable and not excessive. He further contends that, even if he violated Mr. Towsley's constitutional rights, he is entitled to qualified immunity because he acted reasonably, and should not be deemed to have known that using his Taser was unconstitutional.

Qualified immunity shields government officials, including law enforcement officers, "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *McEvoy v. Spencer*, 124 F.3d 92, 97 (2d Cir. 1997) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity protects government officials from lawsuits over errors made while reasonably performing their duties, whether resulting from "a mistake of law, a mistake of fact, or a mistake of mixed questions of law and fact." *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting)).

Granting summary judgment on qualified immunity generally involves a two-part inquiry. First the court asks, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled on other grounds by Pearson*, 129 S. Ct. at 821. If Mr. Towsley's constitutional rights were not violated then the issue of qualified immunity need not be further addressed, since "where there is no viable constitutional claim, defendants have no need of an immunity shield." *Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007) (internal citations omitted). Assuming a constitutional violation, the next question is "whether the right was clearly established . . . in light of the specific context of the case." *Id.*

### A. The Fourth Amendment Applies to Mr. Towsley's Claims of Excessive Force.

Before reaching the merits of Mr. Towsley's excessive force claim, the court must identify "the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394 (1989). Here, as "[i]n most

7

instances, that will be either the Fourth Amendment's prohibition against unreasonable seizures of the person, or the Eighth Amendment's ban on cruel and unusual punishments, which are the two primary sources of constitutional protection against physically abusive governmental conduct." *Id.* The Fourth Amendment applies to excessive force claims that arise in the context of an arrest or investigatory stop of a free citizen. *Id.*; *see also Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006). For those individuals who have been convicted and are serving a term of imprisonment, the Eighth Amendment "serves as the primary source of substantive protection . . . in cases . . . where the deliberate use of force is challenged as excessive and unjustified." *Graham*, 490 U.S. at 395 n.10 (quoting *Whitley v. Albers*, 475 U.S. 312, 327 (1986)).

Officer Frank argues that the Eighth Amendment governs Mr. Towsley's claim of excessive force because the "fact that the Plaintiff was on parole at the time of his arrest does not alter his status as a convicted felon in the custody of the Department of Corrections." (Doc. 39-1 at 9.) Neither the Supreme Court nor the Second Circuit has squarely decided whether a parolee—someone who is "free" in the sense that he is not incarcerated, but who is also subject to an existing prison sentence if he violates parole—is protected by the Fourth or the Eighth Amendment's limitations on the government's use of force. However, the weight of authority, including decisions from district courts in the Second Circuit, favors applying the Fourth Amendment standard to Mr. Towsley's claims.

In *Turner v. White*, 443 F. Supp. 2d 288 (E.D.N.Y. 2005), the court explained why the Fourth Amendment applies to parolees' claims of excessive force in the course of an arrest:

> [j]ust because an individual has been convicted of a crime in the past and is on parole does not deprive him of his Fourth Amendment constitutional right to be free from excessive force if arrested on another crime. Although the Eighth Amendment "serves as the primary source of substantive protection . . . " in cases where the defendant has been convicted, is incarcerated, and there is a deliberate use of excessive and unjustified force, in this instance, the excessive force was allegedly applied by officers in

8

> connection not with plaintiff's conviction, but rather with some new offense
> or violation they believed had been committed.

*Id.* at 294 (quoting *Graham*, 490 U.S at 395 n.10) (internal citation omitted). The same situation is presented here. Although Mr. Towsley remained subject to an existing prison sentence with a maximum release date in 2014, he was not incarcerated when Officer Frank tased him, and his arrest was justified not by his prior conviction or his status as a parolee, but by the separate violation of his parole conditions. *See also Freeland v. Sacramento City Police Dep't*, 2010 WL 408908, at *12 (E.D. Cal. Jan. 29, 2010) (applying Fourth Amendment to excessive force claim because, "[a]lthough the plaintiff was on parole at the time the events alleged took place, . . . the alleged excessive us[e] of force by the defendants took place during the course of plaintiff's arrest on a suspected parole violation for which he had not yet been convicted or sentenced); *Comfort v. Jackson Cnty.*, 2010 WL 2817183, at *3 (D. Or. July 16, 2010) (dismissing Eighth Amendment claim because parolee arrested for a parole violation for which he has not yet been convicted "may not seek relief under the Eighth Amendment"); *Williams v. Cnty. of Riverside*, 2008 WL 4791291, at *7 (C.D. Cal. Oct. 29, 2008) ("Plaintiff's claim of excessive force arose while he was a 'parolee at large.' Thus, plaintiff has not yet been convicted or sentenced. Accordingly, there is no basis for a claim under the Eighth Amendment"); *Blake v. Base*, 1998 WL 642621, at *10 n.21 (N.D.N.Y. Sept. 14, 1998) (finding that parolee's claims of excessive force "are not properly analyzed under the Eighth Amendment because the Amendment's prohibition against the use of excessive force attaches only after conviction").

Some courts in other jurisdictions have applied the Eighth Amendment to excessive force claims brought by parolees challenging conditions of confinement, but such cases are distinguishable. For example, in *Hamilton v. Lyons*, 74 F.3d 99, 103 (5th Cir. 1996), the Fifth Circuit distinguished between parolees who are detained on a parole violation, and other pretrial detainees who are not on parole. Generally, it is a Fourteenth Amendment substantive due process violation for detention officers to take punitive

action against pretrial detainees, because pretrial detainees enjoy a due process right not to be punished for pending charges. *See Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979). But the Fifth Circuit held that the same is not necessarily true for parolees who are detained on an alleged parole violation. *Hamilton*, 74 F.3d at 106. The court reasoned that "[u]nlike the typical pretrial detainee, the justification for the detention of a detained parolee is dual. . . . [T]he detention and subsequent reincarceration of a parolee are only *triggered* by the new arrest; the detention and subsequent reincarceration are *justified* by the prior conviction." *Id.* at 106. In other words, when a parolee is returned to prison because of a parole violation, the detention is justified *both* by his or her prior conviction and existing prison sentence, *and* his or her subsequent parole violation.

The same is not true, however, with regard to a parolee's *arrest*. There is no "dual" justification for arresting a parolee. Instead, an arrest must be justified by parole violations that are distinct from the prior conviction. *See Scotto v. Almenas*, 143 F.3d 105, 113 (2d Cir. 1998) ("Scotto alleges that Almenas fabricated a parole violation and arrested him knowing he lacked probable cause to do so. Such conduct . . . would plainly violate Scotto's clearly established right to be free from arrest in the absence of probable cause").

For these reasons, the court concludes that the Fourth Amendment applies to Mr. Towsley's claim of unconstitutional excessive force.

### B. Excessive Force.

The Fourth Amendment's general reasonableness standard governs claims of excessive force. *Jones*, 465 F.3d at 61. "In order to establish that the use of force to effect an arrest was unreasonable . . . plaintiffs must establish that the government interests at stake were outweighed by the 'nature and quality of the intrusion on [plaintiffs'] Fourth Amendment interests." *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 123 (2d Cir. 2004) (quoting *Graham*, 490 U.S. at 396). This inquiry "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate

threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396; *see also Amnesty America*, 361 F.3d at 123 (explaining that whether use of force is reasonable depends on "the totality of the circumstances faced by the arresting officer.").

At the summary judgment stage, once the court has determined the relevant set of facts and drawn all inferences in favor of the nonmoving party, the reasonableness of the officer's actions is a pure question of law. *See Scott*, 550 U.S. at 381 n.8. The reasonableness determination must be made from the "perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. This means that the "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010) (quoting *Graham*, 490 U.S. at 397).

In evaluating both motions for summary judgment, the parties agree that the two Taser deployments should be analyzed independently.

### i. Officer Frank is Entitled to Summary Judgment on the First Tasing.

With regard to the first Taser deployment that occurred inside the apartment, Officer Frank acted reasonably because the intrusion upon Mr. Towsley's Fourth Amendment interests does not outweigh the governmental interests served by using the Taser to effect Mr. Towsley's arrest. Mr. Towsley was a convicted felon under the influence of narcotics who behaved belligerently throughout the encounter. He yelled at the officers, used profanity, threatened to take the Taser and "shove it up [Officer Frank's] ass," and stated that he would flee by jumping out the window. He also failed to comply with twenty-six direct orders to submit to arrest. When Officer Frank deployed his Taser, Mr. Towsley was backing away as CO Franklin approached him with handcuffs. Given these facts, including Mr. Towsley's history of violence, fleeing police,

11

and resisting arrest, a reasonable officer could have concluded that Mr. Towsley posed an imminent risk of harm to the officers, was actively resisting arrest, and was at risk to flee. Under these circumstances, the government interests at stake were significant. *See Graham*, 490 U.S. at 396 (noting that reasonableness of force depends in part on whether suspect posed a risk to harm others, was actively resisting arrest, or was attempting to flee).

The court must also consider, however, that using the X26 Taser has been described as a "more than non-serious or trivial use of force but less than deadly force," that is a "serious intrusion into the core of the interests protected by the Fourth Amendment[.]"[2] *Mattos v. Agarano*, 590 F.3d 1082, 1087 (9th Cir. 2010).

When balancing the government interests at stake against those of the individual as *Graham* requires, reasonableness must be judged from the perspective of an officer on the scene, and detached hindsight cannot be used to correct judgments made in "circumstances that are tense, uncertain, and rapidly evolving." *Graham*, 490 U.S. at 396. In this case, Officer Frank confronted a suspect with a history of violence who was under the influence of drugs, and who was verbally combative with the officers. *See Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004) (describing officer's confrontation with a suspect who swore and yelled at the officer as "a tense and difficult situation"). The situation became increasingly tense and uncertain as Mr. Towsley repeatedly failed to submit to arrest. Ultimately, as Mr. Towsley backed away from CO Franklin, Officer Frank made the judgment that using the Taser was required to effectively place Mr. Towsley under arrest. In doing so, Officer Frank avoided a situation in which the officers would have had to go "hands on" with a combative

---

[2] In addition to firing barbs that are lodged into a suspect's skin, the X26 Taser can also be placed directly onto a suspect's skin, a method of use referred to as "drive-stun" mode. Courts have recognized that using a Taser in drive-stun mode constitutes a somewhat lesser degree of force than using it as Officer Frank did. *See, e.g., Crowell v. Kirkpatrick*, 667 F. Supp. 2d 391, 408 (D. Vt. 2009); *Bryan v. MacPherson*, --- F.3d ---, 2010 WL 4925422, at *2 n.1 (9th Cir. Nov. 30, 2010).

suspect, a situation that could result in serious injury to both the officers and Mr. Towsley. *See id.*

Mr. Towsley argues that these circumstances cannot justify use of the Taser because he was no longer resisting arrest by the time it was deployed. Instead, he claims that, during the last few seconds of the encounter, he had agreed to surrender and was simply cataloging his personal effects in preparation for arrest. Thus, Mr. Towsley views himself as similarly situated to the plaintiff in *Tracy v. Freshwater, supra,* who alleged that an officer sprayed him in the face with pepper spray after he had submitted to arrest and was already handcuffed. There, the court held that it was reasonable for the officer-defendant to believe that Tracy had initially resisted arrest by attempting to flee, but found that a reasonable jury could conclude that use of pepper spray was unreasonable if it occurred after Tracy was restrained in handcuffs and was no longer resisting. *Tracy,* 623 F.3d at 98-99; *see also Parker v. Gerrish,* 547 F.3d 1, 10 (1st Cir. 2008) ("that [the suspect] had earlier harassed or resisted the officers does not justify use of the Taser."). Unlike Tracy, Mr. Towsley concedes that he was not handcuffed or otherwise restrained when Officer Frank fired the Taser. And while Mr. Towsley now claims that he had "surrendered," it was objectively reasonable for Officer Frank to conclude otherwise. Mr. Towsley did say that he would turn around and submit to arrest if he could "put [his] fuckin' shirt on," and if the officers would "put that gun away," but, at the same time, Mr. Towsley concedes that he was backing away as CO Franklin approached with handcuffs when the Taser was fired. With Mr. Towsley moving toward the window through which he had threatened to escape, rather than allowing himself to be handcuffed, it was reasonable for Officer Frank to believe that Mr. Towsley was simply continuing his efforts to avoid arrest.

*Parker v. Gerrish, supra,* in which the First Circuit upheld a jury award for the plaintiff on an excessive force claim, is similarly distinguishable. There, the court found that a jury could have reasonably found that the plaintiff, who had one wrist handcuffed, was merely positioning his other wrist to be handcuffed when the defendant-officer shot

13

him with a Taser. *Parker*, 547 F.3d at 9-10. Here, by contrast, it is undisputed that Mr. Towsley was neither handcuffed nor partially handcuffed when Officer Frank deployed his Taser.

The circumstances in this case are analogous to those present in *Draper v. Reynolds*, *supra*. There, the plaintiff-suspect was a truck driver stopped by the officer-defendant on a dark highway for failing to have a properly illuminated taillight. The officer asked the plaintiff to retrieve certain documents from the cab of his truck, and the plaintiff responded by acting "hostile belligerent, and uncooperative." *Draper*, 369 F.3d at 1278. The officer asked for the plaintiff's compliance five separate times, to which the plaintiff levied accusations of harassment, "moved around and paced with agitation," and yelled at the officer using profanity. After the fifth unheeded instruction, the officer deployed his Taser in the same fashion as Officer Frank, striking the plaintiff in the chest. *Id*. The court held that this force was not excessive because the plaintiff had repeatedly failed to comply with officer commands, and because attempting to physically handcuff the plaintiff—that is, going "hands on"—"would likely have . . . escalated a tense and difficult situation into a serious physical struggle in which either [the plaintiff or the officer] would be seriously hurt." *Id*.

In addition, the crime for which Mr. Towsley was arrested (a parole violation involving the use of drugs and possibly missing mandatory drug rehabilitation classes) was serious, and it was therefore reasonable under the circumstances for Officer Frank to use significant non-lethal force to effectuate Mr. Towsley's arrest. This conclusion is consistent with recent cases from this court and the Second Circuit holding that use of a Taser is reasonable in order to arrest suspects who have resisted less forceful means of arrest. *See Crowell v. Kirkpatrick*, 667 F. Supp. 2d 391, 409 (D. Vt. 2009) ("using a Taser as a last resort to effect the arrests of suspects who are resisting, who have repeatedly been given lawful orders with which they could have easily complied, and who received . . . warnings specifically about the use of [the Taser], is not unreasonable"), *aff'd* 2010 WL 4595545 (2d Cir. Nov. 15, 2010).

Finally, although Officer Frank knew that the Taser would likely force Mr. Towsley into an uncontrolled fall, it is not reasonable to charge him with knowing that Mr. Towsley would be propelled through a glass pane and a storm window. The Taser training manuals on which Mr. Towsley relies for a contrary conclusion warn that Tasers can "cause secondary injuries from a person falling . . . particularly from elevated heights," and that common effects of the Taser include the "[s]ubject fall[ing] immediately to the ground." (Doc. 47-1, Pl.'s Statement of Undisputed Material Facts, ¶ 62.) But had Mr. Towsley fallen immediately to the ground, he would have fallen only a few feet and would not have landed on the street outside. Mr. Towsley was not standing in an elevated position such as a "roof, fire escape, tree, bridge, [or] stairwell" where the likelihood of a long fall is evident. *Id.* ¶ 63; *see McKenney v. Harrison*, 2010 WL 560891, at *7 (D. Neb. Feb. 10, 2010) (finding that a reasonable officer could conclude that using a Taser against a suspect who lunged at a second story window would cause him to fall to the floor rather than go through the window). Thus, examining the facts without the use of hindsight, Officer Frank had a reasonable belief that tasing Mr. Towsley would merely cause him to fall to the floor, and would not force him through the window in the absence of any contributing efforts by Mr. Towsley.

Because Officer Frank acted reasonably under the circumstances when he deployed his Taser inside the apartment, he did not violate Mr. Towsley's Fourth Amendment rights, and he is entitled to summary judgment. For this same reason, Mr. Towsley's motion for summary judgment as to the first tasing must be denied.

### ii. Material Factual Disputes Preclude Summary Judgment on the Second Tasing.

Officer Frank's second deployment of the Taser while Mr. Towsley was on the sidewalk presents disputed issues of material facts that cannot be resolved on summary judgment. Officer Frank contends that the second tasing was reasonable because he saw Mr. Towsley partially rise from the sidewalk, which Officer Frank interpreted as an attempt to flee. Mr. Towsley claims that Officer Frank could not have reasonably concluded that Mr. Towsley was trying to escape. Mr. Towsley points to (1) the severity

of his injuries; (2) what he claims is audible moaning on the cruiser recordings after the first tasing; (3) the short two-second interval between each tasing; and (4) Officer Frank's loud recorded statement that, "I got him. I still got him" (as opposed to, for example, "he's getting away"). These are facts, all supported by evidence in the record, from which a reasonable jury could infer that Mr. Towsley never partially rose from the sidewalk, and that Officer Frank's version of the events is not credible. *See Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) ("An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.") (internal quotation marks omitted); *Curry v. City of Syracuse*, 316 F.3d 324, 333 (2d Cir. 2003) ("It is well established that credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.") (internal quotation marks omitted).

Accordingly, Officer Frank is not entitled to summary judgment on the issue of excessive force as to the second Taser deployment. *See Bryan v. MacPherson*, --- F.3d ---, 2010 WL 4925422, at *1 (9th Cir. Nov. 30, 2010) (finding it unreasonable to use Taser against suspect who "was obviously unarmed, made no threatening statements or gestures, [and] did not resist arrest or attempt to flee"); *Brown v. City of Golden Valley*, 574 F.3d 491, 497 (8th Cir. 2009) (denying summary judgment for officer who used Taser against a suspect who was not armed, actively resisting arrest, or attempting to flee); *Casey v. City of Federal Heights*, 509 F.3d 1278, 1282 (10th Cir. 2007) (finding it unreasonable to use Taser against "nonviolent misdemeanant who was neither dangerous nor fleeing").

Likewise, Mr. Towsley has not demonstrated his entitlement to summary judgment on the second tasing. If a jury believes Officer Frank's account, it may also conclude that the second tasing was a reasonable use of force. *See, e.g., Riley v. Harris Cnty. Sheriff's Dep't*, 2009 WL 5216914, at *6 (M.D. Ga. Dec. 29, 2009) (granting summary judgment in favor of officer who used Taser to prevent a suspect wanted for unpaid child support from fleeing, even though suspect presented no evident risk of harm to others); *see also*

*Beaver v. City of Federal Way*, 507 F. Supp. 2d 1137, 1145 (W.D. Wash. 2007) (holding that it was reasonable for officer to deploy his Taser a third time against a burglary suspect "who was apparently under the influence of controlled substances, who ignored [officer] commands to stop, and who was attempting to rise and perhaps to flee"). Mr. Towsley's partial motion for summary judgment is therefore DENIED.

### C. Qualified Immunity for the Second Tasing.

Although a jury could find that Officer Frank used excessive force in deploying his Taser a second time, he is still entitled to summary judgment if he satisfies the second prong of qualified immunity, that is, if Mr. Towsley's rights were not clearly established at the time of the violation. *See Tracy*, 623 F.3d at 99 n.5.

To determine whether a right is clearly established, courts in the Second Circuit look to: "(1) whether the right was defined with reasonable specificity; (2) whether Supreme Court or court of appeals case law supports the existence of the right in question; and (3) whether under preexisting law a reasonable defendant would have understood that his or her acts were unlawful." *Scott v. Fischer*, 616 F.3d 100, 105 (2d Cir. 2010). While these factors focus on the specific circumstances of a particular case, it does not mean that "an official action is protected by qualified immunity unless the very same action in question has previously been held unlawful." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Instead, the question is whether pre-existing law from this and other circuits makes it "apparent," or provides officers with "fair warning," that the specific conduct in question is unlawful. *Id.*; *see also Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *Scott*, 616 F.3d at 105 (explaining that courts may rely on precedent from other circuit courts of appeals in deciding that a right is clearly established and denying qualified immunity).

Officer Frank argues that Mr. Towsley has not alleged a violation of a clearly established right because there is no "preexisting case law which is sufficiently similar factually to the case at issue" finding that an officer used excessive force. (Doc. 39-1 at 20.) Without such specific guidance, Officer Frank argues, he did not have sufficient

notice that using his Taser after Mr. Towsley fell through the window and landed on the pavement would violate the Fourth Amendment, and it was reasonable for him to believe that his conduct was lawful. The relevant inquiry, however, is not whether Officer Frank knew to a certainty that his conduct was unlawful, but whether he had fair warning that his conduct would constitute excessive force. *See Saucier*, 533 U.S. at 202 ("The relevant, dispositive inquiry is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted"); *Hope*, 536 U.S. at 741 ("officials can still be on notice that their conduct violates established law even in novel factual circumstances"); *Casey*, 509 F.3d at 1284 ("when an officer's violation of the Fourth Amendment is particularly clear from *Graham* itself, we do not require a second decision with greater specificity to clearly establish the law").

      Accepting for purposes of summary judgment that Mr. Towsley's version of the facts is true, using significant force in the form of a Taser against a suspect who is neither resisting nor fleeing arrest, and who may be seriously injured, serves no legitimate government interest and therefore satisfies *Graham's* excessive force standard. As the Second Circuit has explained, "it was well established [by 2000] . . . that the use of entirely gratuitous force is unreasonable and therefore excessive." *Tracy*, 623 F.3d at 99 n.5 (citing *Breen v. Garrison*, 169 F.3d 152, 153 (2d Cir. 1999)). In *Tracy*, the court noted that, "in light of this precedent, we presume that no reasonable officer could have believed that he was entitled to use pepper spray gratuitously against a restrained and unresisting arrestee." *Id.* Similarly here, if a jury agrees with Mr. Towsley's version of the facts, it could also find that Officer Frank's use of force was gratuitous and therefore a violation of Mr. Towsley's clearly established constitutional rights. Accordingly, summary judgment cannot be granted for Officer Frank on the basis of qualified immunity. *See Casey*, 509 F.3d at 1286 (rejecting claim for qualified immunity where there were no cases precisely on point, but where "use of the Taser was without any legitimate justification in light of *Graham*").

## IV. Conclusion.

For the reasons set forth above, Officer Frank's motion for summary judgment (Doc. 39) is GRANTED as to the first Taser deployment, but DENIED as to the second Taser deployment; Mr. Towsley's cross-motion for partial summary judgment (Doc. 47) is DENIED.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 28th day of December, 2010.

Christina Reiss, Chief Judge
United States District Court